******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JOHN A. MASSARO
## (AC 43323)

Moll, Alexander and DiPentima, Js.

*Syllabus*

Convicted of the crime of the sale of a narcotic substance, the defendant appealed to this court. The defendant sold crack cocaine to M, who testified about the drug sale at trial. Prior to trial, M was interviewed and gave a statement to a defense investigator, P, who provided a memorandum containing M's statement to defense counsel. In her statement, M indicated that she had possessed narcotics prior to meeting with the defendant and that she provided narcotics to the defendant. The parties agreed prior to trial that the state would not present expert testimony from its witnesses regarding narcotics trafficking. During trial, it was discovered that defense counsel failed to timely disclose P's memorandum. The trial court concluded that P's memorandum was not protected attorney work product and should have been disclosed to the state pursuant to the relevant rule of practice (§ 40-15). The court imposed a sanction on the defense limiting P's testimony and ruled that P's memorandum would not come into evidence. The trial court ordered defense counsel to provide a redacted copy of the memorandum to the prosecutor and to make P available for subsequent questioning. Defense counsel called P as a witness, who testified that M provided narcotics to the defendant on the day of his arrest. Immediately following this testimony, the court provided the jury with a limiting instruction that the testimony was to be used only for the purpose of impeaching M's prior inconsistent statement that she had purchased narcotics from the defendant. During his cross-examination of P, a former law enforcement officer, the prosecutor asked a series of questions regarding the sale and use of drugs. After P had answered these questions, defense counsel objected on the ground that the parties' agreement did not permit opinion testimony regarding the narcotics trade and that P had not been offered as an expert. The court denied defense counsel's motion for a mistrial. The trial court also denied the defendant's motion for a new trial on the basis of prosecutorial impropriety. *Held*:

1. The defendant could not prevail on his claim that the trial court abused its discretion in determining that defense counsel had violated discovery rules and by imposing a sanction limiting P's testimony as a result of that violation as any error relating to the court's discovery ruling and sanction was harmless: although the trial court improperly determined that P's memorandum constituted M's statement pursuant to § 40-15 and imposed a sanction limiting P's testimony regarding his memorandum, this court, in reviewing the entirety of the evidence adduced at trial, concluded that the record sufficiently provided a fair assurance that any nonconstitutional error relating to the determination of a discovery violation did not substantially affect the verdict, as the defendant was able to present to the jury the fact that M had made a prior inconsistent statement in which she claimed to have possessed the narcotics prior to her meeting with the defendant, and there was ample evidence presented by the state that M was the buyer and that the defendant was the seller in the narcotics transaction.

2. The defendant could not prevail on his claim that the trial court abused its discretion in permitting the prosecutor to go beyond the scope of direct examination on his cross-examination of P and to convert him into an expert witness regarding the narcotics trade after the parties had agreed not to present expert testimony on that topic: even assuming, arguendo, that the court's evidentiary rulings regarding the state's cross-examination of P constituted an abuse of discretion, any such error was harmless as this court could not conclude that the jury's verdict was substantially swayed by the state's cross-examination of P, as testimony from several witnesses supported the state's case that the defendant sold the narcotics.

3. The defendant failed to establish that his due process right to a fair trial was violated as a result of prosecutorial impropriety:

a. The defendant failed to establish that any impropriety occurred during the prosecutor's cross-examination of P when P was asked if he knew the state had been unaware of the statement M purportedly had made to P regarding the possession of narcotics; contrary to the defendant's claim, P did not impugn the integrity of defense counsel as the thrust of the prosecutor's inquiry was on the actions of P, and not defense counsel, specifically, the prosecutor highlighted for the jury the contrast of P's statements on his company's website and P's actions, and this line of inquiry served to challenge P's credibility, rather than to demean the integrity or role of defense counsel; moreover, the prosecutor did not mention the relevant rules of practice regarding the timing of discovery materials to the jury.

b. The prosecutor's challenged comment during closing argument that the defendant "behaved himself well in court" was not improper; the remark was made in the context of the prosecutor's proper comments that the jurors were required to put aside any sympathy for the defendant, due to his age, and to decide the case on the basis of the evidence presented, and the challenged comment focused solely on the defendant's good in-court behavior and did not suggest, in any manner, any sort of illicit or untoward out-of-court conduct, and this court declined to infer the most damaging interpretation of the prosecutor's comment.

c. Although this court declined to decide whether the prosecutor's comment regarding M's credibility, that she was "open and honest" with certain aspects of the narcotics transaction, was improper, this court concluded that the defendant failed to establish a deprivation of his due process right to a fair trial; the comment was not severe, it was isolated, it was corrected by the prosecutor immediately, it was ameliorated by a specific jury charge, and much of the M's testimony was corroborated by other witnesses.

Argued January 6—officially released July 13, 2021

*Procedural History*

Substitute information charging the defendant with the crime of sale of narcotics, brought to the Superior Court in the judicial district of Litchfield at Torrington, geographical area number eighteen, and tried to the jury before *Danaher, J.*; thereafter, the court denied the defendant's motion for a mistrial; verdict and judgment of guilty; subsequently, the court denied the defendant's motion for a new trial, and the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Samantha L. Oden*, deputy assistant state's attorney, *Dawn Gallo*, state's attorney, and *David R. Shannon*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. The defendant, John A. Massaro, appeals from the judgment of conviction, following a jury trial, of the sale of a narcotic substance in violation of General Statutes § 21a-277 (a). On appeal, the defendant claims that (1) the court abused its discretion in determining that defense counsel had violated discovery rules and by imposing a sanction as a result of that violation, (2) the court abused its discretion with respect to its evidentiary ruling regarding the state's cross-examination of a defense witness, and (3) he was deprived of his due process right to a fair trial as a result of prosecutorial impropriety. We disagree, and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On July 13, 2017, Matthew Faulkner, a Torrington police officer assigned to the narcotics division, was on duty when he observed two known narcotics users, Sarah Mikuski[1] and her boyfriend, Anthony Roig, walking on East Main Street. Faulkner then saw the defendant approaching Mikuski and Roig. Faulker continued his surveillance of these individuals and watched as the defendant exchanged "something" with Mikuski. After this brief exchange, the defendant travelled in an opposite direction away from Mikuski and Roig.[2] Believing that a "hand to hand" illegal narcotic transaction had just occurred, Faulker called for assistance, requesting that the responding officer intercept the defendant before he returned to his residence. The police, however, were unable to locate the defendant that day.

Faulkner approached Mikuski and Roig. He instructed Mikuski to surrender the item that the defendant had given her. She complied and placed a small clear plastic bag containing a white powdery substance, later determined to be crack cocaine,[3] on the wall next to them. Mikuski also emptied her purse, which contained an assortment of used drug paraphernalia, including empty wax packets, needles, crack pipes containing a burnt residue, and Brillo pads used to filter crack cocaine when it is smoked. Mikuski admitted that she handed the defendant a cigarette packet with $26 tucked inside it and purchased $30 worth of crack cocaine from the defendant.[4] Mikuski also admitted that she had purchased illegal substances from the defendant in the past. Mikuski did not have any other illegal substances or cash in her possession.

The defendant subsequently was arrested and charged in an amended long form information with the sale of a narcotic substance in violation of § 21a-277 (a).[5] After a two day trial, the jury found the defendant guilty. On May 8, 2019, the court sentenced the defendant to ten years of incarceration, execution suspended after six years, and five years of probation. This appeal followed. Additional facts will be set forth as necessary.

## I

The defendant first claims that the court abused its discretion when it determined that defense counsel had violated discovery rules and by imposing a sanction as a result of that violation. The defendant argues that the court erred in finding that notes of his investigator, Benjamin Pagoni, constituted a statement as defined by the rules of practice. Specifically, the defendant contends that Pagoni's notes of the interview that he had conducted with Mikuski on March 5, 2018, did not constitute a statement and, accordingly, were not required to be disclosed to the state. The defendant also argues that, as a result of this ruling, the court erroneously imposed a sanction limiting Pagoni's testimony. We conclude that any error relating to the court's discovery ruling and sanction was harmless.

The following additional facts are necessary for the resolution of this claim. Pursuant to Practice Book §§ 40-7, 40-13, 40-18, and 40-27, the state filed a motion on October 26, 2017, requesting that the defendant disclose "any statements of the witnesses other than the defendant in his possession or in the possession of an agent of the defendant which statement relates to the subject matter about which such witness will testify . . . ." On January 7, 2019, defense counsel disclosed the defendant and Pagoni as potential witnesses.

Mikuski testified on cross-examination that she had spoken with Pagoni on March 5, 2018. She denied telling Pagoni that she had possessed narcotics prior to meeting the defendant or that she was going to provide narcotics to the defendant.

After the state had rested, the court requested that defense counsel make an offer of proof regarding Pagoni and his testimony. Defense counsel stated that Pagoni worked as an investigator and would testify about a prior statement made to him by Mikuski that was inconsistent with her trial testimony identifying the defendant as the narcotics seller. Specifically, Pagoni would testify that Mikuski had told him that she possessed narcotics prior to meeting with the defendant on July 13, 2017, and that she gave narcotics to the defendant prior to her arrest. Defense counsel represented that he had communicated this information via e-mail to the prosecutor the day before.[6] He further indicated that Pagoni had provided him with a memorandum detailing his conversation with Mikuski and that this memorandum (Pagoni memorandum) had been in his possession since approximately March 12, 2018.

The prosecutor argued that Miksuki's purported inconsistent statement should not be permitted into evidence because its disclosure had been untimely and thereby constituted a violation of our rules of discovery, specifically, Practice Book § 40-15 (2).[7] The court

inquired whether defense counsel had provided the Pagoni memorandum to the state. He replied in the negative, indicating that, in his view, this document constituted protected attorney work product[8] and thus was exempt from disclosure.

The court rejected defense counsel's position that the Pagoni memorandum, even if protected work product, was exempt from disclosure, citing Practice Book § 40-13 (b).[9] The prosecutor noted that the state had submitted a discovery request and, therefore, sought to preclude Pagoni from testifying as a result of the nondisclosure of the Pagoni memorandum.[10] The court ordered defense counsel to provide the prosecutor with a redacted copy of the Pagoni memorandum and to make Pagoni available for questioning. It also deferred ruling on whether Pagoni would be permitted to testify until the next day.

On January 11, 2019, the defendant filed a memorandum of law regarding the admissibility of Pagoni's proposed testimony and whether the Pagoni memorandum constituted a statement that should have been disclosed to the prosecutor.[11] With respect to the Pagoni memorandum, the court stated: "[E]vidence as to the existence . . . of that written statement is not admissible and it will not be the subject of testimony by Pagoni or questioning by any attorney or argument by any attorney." The court further ruled that the testimony of Pagoni, if permitted, would be limited to impeaching Mikuski's testimony that she had purchased the crack cocaine from the defendant and not for the purpose of establishing that she had sold it. It also determined that the Pagoni memorandum constituted a substantially verbatim recital of Mikuski's oral statement that had been recorded sufficiently contemporaneously, so as to meet the definition of a statement as set forth in Practice Book § 40-15. As a result, the court reasoned that defense counsel should have disclosed the Pagoni memorandum to the state. The state declined the court's offer to delay the proceedings. Defense counsel placed his disagreements with the court's ruling and analysis on the record.

Defense counsel called Pagoni as a witness. He stated that he had met with Mikuski on March 5, 2018, and drove her to a nearby Wendy's restaurant. They ordered some food and spoke for approximately ten minutes. Pagoni testified that Mikuski had told him that she provided narcotics to the defendant on July 13, 2017. At this point, the court provided the jury with a limiting instruction that this testimony was to be used only for the purpose of impeaching Mikuski's prior statement that she had purchased narcotics from the defendant.[12]

During cross-examination, the prosecutor inquired about Pagoni's business relationship with defense counsel. Specifically, he asked how many hours Pagoni had worked on this case. When Pagoni replied that he was

uncertain, the prosecutor asked: "So, as you sit here today, you remember specifically what . . . Mikuski said to you but you can't remember—you can't even approximately—how many hours you worked on this case?" Pagoni, indirectly referring to his memorandum, answered: "I can remember what . . . Mikuski said to me because it's written down." The prosecutor objected on the ground that Pagoni's answer was nonresponsive. The court excused the jury and reminded counsel that, during conversations in chambers and on the record, it had indicated that the Pagoni memorandum would not come into evidence. The court then admonished Pagoni and directed him to refrain from mentioning that he had written down or memorialized Mikuski's statements during his testimony. The court iterated this ruling to both defense counsel and Pagoni. The court subsequently instructed the jury to disregard any reference in Pagoni's testimony to a written memorandum. After the prosecutor's cross-examination resumed, Pagoni stated that Mikuski appeared to be under the influence of heroin when he had spoken with her on March 5, 2018. He also admitted that he did not record Mikuski's statement or ask her to make a formal written statement. Additionally, Pagoni acknowledged that he had not asked whether Mikuski had purchased narcotics from the defendant in the past, or why she would have given narcotics to the defendant. Finally, he admitted that he never interviewed Roig to verify any of Mikuski's statements.

Following the close of evidence, the defendant moved for a mistrial on the basis that the prosecutor had impugned the character of defense counsel when he mentioned the late disclosure of Mikuski's purported statement. The prosecutor disputed the assertion that the character of the defense counsel had been impugned as a result of the cross-examination of Pagoni. The court agreed with the prosecutor and denied the motion for a mistrial.

On February 14, 2019, the defendant filed a motion for a new trial pursuant to Practice Book § 42-53. The defendant argued that, as a result of the court's erroneous discovery sanction prohibiting the Pagoni memorandum from being admitted into evidence, he "could not effectively counter the state's impeachment of Pagoni's memory by having Pagoni testify that he had a written memorandum to support his memories of his encounter with Mikuski. As a result, the jury held the impression that Pagoni had 'selective memory' regarding his work on the case."

On May 17, 2019, the court issued a corrected memorandum of decision denying the defendant's motion for a new trial. It again concluded that the Pagoni memorandum constituted a statement for purposes of Practice Book § 40-15, and therefore should have been disclosed to the state. The court concluded that, by calling Pagoni

as a witness, any work product protection had been waived. Next, the court determined that the sanction imposed, precluding the defendant from presenting any evidence that Pagoni had memorialized Mikuski's March 5, 2018 statement, did not constitute an abuse of discretion.

On appeal, the defendant claims that "the trial court abused its discretion in sanctioning the defendant by limiting the use of Pagoni's testimony and limiting his ability to answer the state's question about how he recalled what Mikuski said." He further contends that he was harmed as a result of this abuse of discretion. Specifically, he argues that the Pagoni memorandum of the interview with Mikuski did not constitute her statement for purposes of Practice Book § 40-15.

In its appellate brief, the state acknowledged that, based on the relevant case law and the facts of this case, "it does not appear that Pagoni's memorandum constituted a statement by Mikuski under either subsection of Practice Book § 40-15, as the trial court determined." The state maintained, however, that the Pagoni memorandum constituted Pagoni's statement under Practice Book § 40-15 (1), and, therefore, the court properly determined that it should have been disclosed. The state also claimed that the sanction imposed by the court did not constitute an abuse of discretion. Finally, the state argued, in the alternative, that any error in imposing the discovery sanction was harmless because (1) the defendant was able to present evidence that Mikuski had made an inconsistent statement, (2) the case did not consist of a credibility contest between Mikuski and Pagoni, as independent evidence existed that the defendant was the seller of the narcotics, (3) the court properly struck, as nonresponsive, Pagoni's answer to the prosecutor's inquiry as to why he had recalled what Mikuski told him, but not how many hours he had worked on the case, and (4) the value of Pagoni's memorialization of what Mikuski purportedly had told him would have been undermined by the existing circumstances, namely, that Mikuski was under the influence of narcotics during the interview, that Pagoni had bought her food and had promised her food in the future, and that he never attempted to verify the accuracy of her statements.

We begin our analysis by setting forth our standard of review and the relevant law. The defendant filed a motion for a new trial pursuant to Practice Book § 42-53.[13] This rule of practice is limited to trial errors and provides for the granting of a motion for a new trial in the interests of justice for constitutional error or other materially injurious error. *State* v. *Santaniello*, 96 Conn. App. 646, 672, 902 A.2d 1, cert. denied, 280 Conn. 920, 908 A.2d 545 (2006). The appellate standard of review when considering whether the court properly denied a motion for a new trial is the abuse of discretion stan-

dard. *State* v. *Sanders*, 86 Conn. App. 757, 765–66, 862 A.2d 857 (2005).

This standard also applies to the court's ruling related to discovery. *State* v. *Manousos*, 179 Conn. App. 310, 334, 178 A.3d 1087, cert. denied, 328 Conn. 919, 181 A.3d 93 (2018). In that case, we stated: "[T]he purpose of criminal discovery is to prevent surprise and to afford the parties a reasonable opportunity to prepare for trial. . . . To that end, [t]he trial court has broad discretion in applying sanctions for failure to comply with discovery orders. . . . We review the court's actions in managing discovery pursuant to the abuse of discretion standard." (Citations omitted; internal quotation marks omitted.) Id.; see also *Caccavle* v. *Hospital of St. Raphael*, 14 Conn. App. 504, 507, 541 A.2d 893, cert. denied, 208 Conn. 812, 545 A.2d 1107 (1988).

With respect to nonconstitutional claims, a defendant must show harm resulting from the error. See *State* v. *Jones*, 205 Conn. 723, 728 n.1, 535 A.2d 808 (1988). Accordingly, we apply a harmless error analysis to a motion for a new trial filed pursuant to Practice Book § 42-53. Additionally, in *State* v. *Cavell*, 235 Conn. 711, 720–23, 670 A.2d 261 (1996), our Supreme Court engaged in harmless error analysis with respect to the claim that a discovery sanction had been imposed improperly. In that case, the court noted than any impropriety was nonconstitutional and therefore the defendant bore the burden of establishing harm. Id., 721.

The test for harmless error is well established. "When an error is not of constitutional magnitude, the defendant bears the burden of demonstrating that the error was harmful. . . . The proper standard for review of a defendant's claim of harm is whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 553, 34 A.3d 370 (2012); see also *State* v. *Jackson*, 334 Conn. 793, 818, 224 A.3d 886 (2020).

We agree with the parties that the trial court improperly determined that the Pagoni memorandum constituted Mikuski's statement, as defined by the relevant rules of practice. We nevertheless conclude that such nonconstitutional error, and the resulting sanctions, were harmless.[14] See, e.g., *State* v. *Gansel*, 174 Conn. App. 525, 529–30, 166 A.3d 904 (2017) (reviewing court may assume error and resolve appeal on issue of harmlessness). Mikuski testified that she was not working in July, 2017, but stole money for the purpose of using drugs daily, namely, heroin and crack cocaine. She stated that she knew the defendant because he was a source to obtain drugs and she had purchased them from him in the past. On July 13, 2017, she texted the defendant: "Hey u do a 30 for $26?" Impatient after not

receiving a reply, Mikuski then called the defendant.[15] Mikuski also testified that she and Roig had planned to obtain the illegal narcotics from the defendant and then use them.

After Mikuski was stopped by Faulkner, she placed the bag of crack cocaine and her used drug paraphernalia on a nearby wall. At the time of her arrest, Mikuski did not have any money, as she had given the $26 to the defendant for the bag of narcotics. Mikuski indicated that except for one time in the past, she "never had the means or the money to be able to sell drugs."

Faulkner testified that he knew Mikuski and Roig as "heavy" narcotics users. When he saw them on July 13, 2017, his intention was to observe them and see if they would purchase narcotics from someone. Faulkner stated that he observed the defendant exchange "something" with Mikuski. He then requested assistance from additional officers and stopped Mikuski and Roig because he believed an illegal narcotics transaction had just occurred. Mikuski opened her hand and emptied her purse, which contained a clear plastic cellophane bag with crack cocaine and various used pieces of drug paraphernalia, respectively. Faulkner seized this contraband. He also stated that Mikuski did not have any money on her person at this time.[16] Faulkner observed that the seized crack pipes contained a burnt residue.

Roig testified that on July 13, 2017, his intention was to consume drugs with Mikuski. Roig indicated on that date, Mikuski had money to purchase drugs, met with another individual, and then came back with drugs. During redirect examination, Roig stated that he was with Mikuski as she purchased drugs for them to use.

During cross-examination, Pagoni testified, based on his thirty-four years of law enforcement experience, that individuals addicted to heroin generally do not give their drugs away for free. He admitted that addicts usually do not hold onto drugs before consuming them. Pagoni also stated, based on his experience, that quick, hand-to-hand transactions involving drugs are done to avoid detection and, if an individual had drugs in his or her hand, that would indicate a recent transaction.[17]

Additionally, as noted in the state's brief, the defendant was able to present to the jury the fact that Mikuski had made a prior inconsistent statement in which she claimed to have possessed the narcotics prior to her meeting with the defendant. Given the ample evidence presented by the state that Mikuski was the buyer and the defendant was the seller in the July 13, 2017 narcotics transaction, we conclude that any errors by the court relating to whether the Pagoni memorandum constituted a statement under our rules of practice and the imposition of a discovery sanction were harmless. See, e.g., *State* v. *Grant*, 179 Conn. App. 81, 92–93, 178 A.3d 437 (improper evidentiary ruling found to be harmless

given strength of state's case based on other evidence), cert. denied, 328 Conn. 910, 178 A.3d 1041 (2018); *State v. Rios*, 171 Conn. App. 1, 39–40, 156 A.3d 18 (same), cert. denied, 325 Conn. 914, 159 A.3d 232 (2017). In reviewing the entirety of the evidence adduced during the trial, the record provides us with a fair assurance that any error relating to these matters did not substantially affect the verdict. We conclude, therefore, that the defendant's claim that the court's determination of a discovery violation and its imposition of a sanction must fail as any error was harmless in light of the evidence.

II

The defendant next claims that the court abused its discretion with respect to the evidentiary ruling regarding the state's cross-examination of Pagoni. Specifically, he argues that the court improperly permitted the prosecutor to convert Pagoni, a defense witness, into an expert regarding narcotics trafficking after the parties had agreed that the state would not present expert testimony on this topic. We conclude that any error was harmless.

The following additional facts are necessary for our discussion. The defendant filed a pretrial motion for supplemental discovery on December 4, 2018, seeking information regarding the narcotics unit of the Torrington Police Department, any records of narcotics arrests made by Faulkner, as well as his training, experience, and education relating to the investigation of narcotics crimes. Approximately one month later, the defendant filed a motion in limine to preclude the state's witnesses "from giving expert testimony or opinion testimony regarding drug trafficking or common characteristics of drug dealers." He also moved for the disclosure of the curriculum vitae of any expert witness for the state, the substance of any facts relied on by the state's experts, and a summary of each expert's opinion. Prior to the court addressing these motions, the parties reached an agreement. In their agreement, the state indicated that it would not present expert testimony from its witnesses regarding narcotics trafficking.

During the trial, the defense called Pagoni as a witness. He stated that he had been a Connecticut state trooper for approximately thirty-four years and that in his career he had worked in a variety of assignments, including the narcotics division. During cross-examination, the prosecutor asked if people who possessed drugs normally carried them in their hands while walking down the street. The court overruled an objection based on speculation, and Pagoni responded that sometimes that does, in fact, occur. The prosecutor continued to question Pagoni regarding certain aspects of drug transactions without objection.

After the cross-examination addressed other topics,

the prosecutor asked Pagoni whether drug dealers generally prefer not to conduct sales inside their homes or apartments. Defense counsel objected, arguing that it called for speculation and improper opinion testimony, as Pagoni had not been offered as an expert witness. The court overruled the objection, stating that defense counsel had questioned Pagoni about his law enforcement background on direct examination. The prosecutor then asked a series of questions regarding the sale and use of drugs.[18]

After these questions, the court excused the jury. Defense counsel noted that he objected to the entire line of questioning. He stated that, based on his understanding of the parties' agreement, no opinion testimony regarding the narcotics trade would be permitted at trial and that Pagoni had not been offered as an expert. Defense counsel also moved for a mistrial. The prosecutor countered that the agreement of the parties only prevented the state from calling expert witnesses.[19]

The court ruled that Pagoni had not testified as an expert for the defense or for the state. It further determined that the state was entitled to cross-examine Pagoni to challenge his credibility regarding his law enforcement background and, specifically, his experience in the narcotics division. The court overruled the defendant's objection and denied his motion for a mistrial.

Defense counsel iterated his arguments regarding the state's cross-examination of Pagoni in his motion for a new trial. Specifically, he stated that this cross-examination focused on the issues of narcotics dealing and addiction, and involved expert testimony from an experienced law enforcement officer well beyond the ken of an average member of the jury.[20] In conclusion, the defendant claimed that the state had gone beyond testing Pagoni's credibility and "clearly used [his] law enforcement background as a means to admit expert opinion testimony unfavorable to the defendant." The court rejected this claim in its memorandum of decision denying the motion for a new trial.

On appeal, the defendant claims that the court abused its discretion by permitting the state to go beyond the scope of the direct examination of Pagoni and to "convert" him into an expert witness. Even assuming, arguendo, that the court's evidentiary rulings regarding the state's cross-examination of Pagoni constituted an abuse of discretion,[21] we conclude that any such error was harmless.[22]

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . We have concluded that a nonconstitutional error is harmless when an appellate court has a fair assurance that the

error did not substantially affect the verdict. . . . We previously have considered a number of factors in determining whether a defendant has been harmed by the admission or exclusion of particular evidence. Whether such error is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Considering these various factors, we have declared that the proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error." (Internal quotation marks omitted.) *State* v. *Edwards*, 202 Conn. App. 384, 403, 245 A.3d 866, cert. denied, 336 Conn. 920, 246 A.3d 3 (2021); see also *State* v. *Kirsch*, 263 Conn. 390, 412, 820 A.2d 236 (2003) (defendant must prove abuse of discretion and harm that resulted from such abuse to establish reversible error from evidentiary impropriety).

On the basis of the reasons set forth in part I of this opinion, we cannot conclude that the jury's verdict was substantially swayed by the state's cross-examination of Pagoni. See, e.g., *State* v. *Fernando V.*, 331 Conn. 201, 215, 202 A.3d 350 (2019). The testimony of Faulkner, Mikuski, and Roig, and the accompanying evidence, particularly the text message from Mikuski to the defendant wherein she asked if he would sell her $30 of narcotics for $26, support the state's case that the defendant sold the narcotics on July 13, 2017. In other words, given the other evidence presented by the state, we have a fair assurance that, even if the court improperly allowed the prosecutor to cross-examine Pagoni regarding the narcotics trade, any such error did not substantially affect the verdict. Accordingly, this claim must fail.

### III

Last, the defendant claims that he was deprived of his due process right to a fair trial as a result of prosecutorial impropriety. Specifically, he argues that prosecutorial impropriety occurred during the cross-examination of Pagoni and during closing argument and that he suffered prejudice as a result. The state counters that there was neither impropriety nor prejudice in this case. We conclude that the defendant failed to establish that his due process right to a fair trial were violated as a result of prosecutorial impropriety.

We begin with the relevant legal principles. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether

it had deprived the defendant of his due process [right] to a fair trial. . . . The defendant has the burden to show both that the prosecutor's conduct was improper and that it caused prejudice to his defense. . . .

"In determining whether the defendant was deprived of his due process right to a fair trial, we are guided by the factors enumerated by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). These factors include [1] the extent to which the [impropriety] was invited by defense conduct or argument, [2] the severity of the [impropriety], [3] the frequency of the [impropriety], [4] the centrality of the [impropriety] to the critical issues in the case, [5] the strength of the curative measures adopted, and [6] the strength of the state's case. . . . [A] reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the [impropriety] is viewed in light of the entire trial. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citations omitted; internal quotation marks omitted.) *State* v. *Sinclair*, 332 Conn. 204, 236-37, 210 A.3d 509 (2019); see also *State* v. *Thomas*, 177 Conn. App. 369, 405, 173 A.3d 430, cert. denied, 327 Conn. 985, 175 A.3d 43 (2017).

"[T]he touchstone of due process analysis in cases of alleged prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial impropriety] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 279, 96 A.3d 1199 (2014). Guided by these principles, we address each of the claimed improprieties in turn.

The defendant first claims that impropriety occurred during the prosecutor's cross-examination of Pagoni. The prosecutor asked if Pagoni knew that the state had been unaware of the statement Mikuski purportedly had made to him at the Wendy's restaurant regarding the possession of the narcotics. The court overruled a relevance objection made by defense counsel. The prosecutor then stated: "You're aware that what you testified to today, what you claim [Mikuski] said to you at the Wendy's, that wasn't made—the state—you did not make the state or [defense counsel] did not make the state aware of that until the day before the trial. You can look at me. You don't need to look at [defense counsel]." Defense counsel again objected, and an off-

the-record discussion occurred. Pagoni then admitted that he knew that the state did not learn about his claim regarding Mikuski's statement at the Wendy's restaurant until the day before the trial.

Later, Pagoni stated that, in the past, when he took statements that tended to exculpate someone, he had shared that information with a prosecutor, and, in one instance, "well in advance" of the trial. The court overruled defense counsel's objection based on relevance. Finally, Pagoni stated that his company's website advertised that it maintained "excellent relationships with local and state law enforcement . . . ."

Subsequently, and outside of the presence of the jury, defense counsel moved for a mistrial based on these matters. Specifically, he argued: "[T]here were some questioning early on in the examination of Mr. Pagoni with respect to the disclosure of the oral statement— yeah, it was relating to the contents of the oral statement in that it questioned along the lines that [defense counsel] just disclosed that last night. I think that's improper, Your Honor, and I objected because I thought it was improper. I think it impermissibly impugns my character [and] integrity. The discovery rules aren't really something for the jury to consider. Other than me taking the stand to explain it to the jury, there's no real way to rebut that. There's no witness that I'm prepared to call that can explain why that happened or our position with it so it paints the defense and in particularly me in a negative light in front of the jury. I think it is detrimental to my client's right to a fair trial so that is my objection and just in case I need to do it for the record, Your Honor, I would ask for a mistrial based on that improper comment and the impact it may have to my client's right to a fair trial."

The prosecutor countered that the questions were not intended to impugn the integrity of defense counsel, nor did they do so; rather, they contrasted the statement on Pagoni's website and what had occurred in the present case with respect to the disclosure of Mikuski's purported statement. The court, after noting its agreement with the prosecutor, stated: "What [the prosecutor] established was a fact, that he only received the information on the eve of trial. That was a simple fact. As to whether it was improper or not, there's no evidence before the jury as to whether it was improper or not. There's no evidence and nor should there be that the jurors know the rules of the Practice Book, the rules of discovery, when statements should be produced. It also is appropriate because the state only had the opportunity to do whatever investigation it could yesterday and the questioning serves to explain to the jury why the investigation of Mr. Pagoni took place yesterday. . . . And so [the state has] the right to establish why [it] didn't meet with Mr. Pagoni until shortly before he testified."

"We are mindful . . . of the unique responsibilities of the prosecutor in our judicial system. . . . [T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel." (Citation omitted; internal quotation marks omitted.) *State* v. *Outing*, 298 Conn. 34, 82, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011); see also *State* v. *Fasanelli*, 163 Conn. App. 170, 180, 133 A.3d 921 (2016); *State* v. *Kendall*, 123 Conn. App. 625, 643, 2 A.3d 990, cert. denied, 299 Conn. 902, 10 A.3d 521 (2010).

We agree that the challenged actions of the prosecutor during the cross-examination of Pagoni did not impugn the integrity of defense counsel. The thrust of the prosecutor's inquiry was on the actions of Pagoni, and not of defense counsel. Specifically, the prosecutor highlighted for the jury the contrast of the statements on his company's website and Pagoni's actions in the present case. This line of inquiry served to challenge Pagoni's credibility, rather than to demean the integrity or role of defense counsel. See *State* v. *Fasanelli*, supra, 163 Conn. App. 180 (distinction between argument that disparages integrity or role of defense counsel and one that disparages theory of defense); *State* v. *Kendall*, supra, 123 Conn. App. 643–44 (prosecutor's closing argument highlighted difference between state's and defendant's versions and inferences of case). Additionally, we note that the prosecutor did not mention our rules of practice regarding the timing of discovery materials to the jury. For these reasons, we conclude that the defendant has failed to establish that any impropriety occurred during the prosecutor's cross-examination of Pagoni.

The defendant next argues that two instances of prosecutorial impropriety occurred during closing argument. "[O]ur Supreme Court has acknowledged that prosecutorial impropriety of a constitutional magnitude can occur in the course of closing arguments. In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . While a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Consequently, the state must avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from [its] duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Carey*, 187 Conn. App. 438, 454–55, 202 A.3d

1067 (2019), aff'd,      Conn.     ,     A.3d     (2020).

During closing argument, the prosecutor stated: "It is extremely important when you reach your verdict that feelings of sympathy don't come into play. And again, we're asking for something that might be counter-intuitive for some of you. Some people may come in here and say, listen, it is what it is. I call it how I see it and that's it. It's not a big problem for me. Some people may say that and then not realize that sympathy does, kind of, trickle into your deliberations, we're humans. Some people come in and say, no, I know it's going to be an issue, but I can put it out of my mind and I'm sure they can. It's extremely important that you don't sit there when you deliberate on this case and say geez, [the defendant] seems like an old guy. *He behaved himself well in court.* You know, wasn't a lot of drugs. I can't say guilty even though the state proved its case, if you feel the state proved its case. You can't do that." (Emphasis added.)

After the arguments of counsel had been completed, defense counsel objected to the prosecutor's comment regarding the in-court behavior of the defendant. He argued that this comment suggested that the prosecutor had knowledge of how the defendant may have acted outside of the courtroom and, thus, amounted to a comment based on facts not presented to the jury. The court determined that the comment constituted a compliment and was made in the context that the jurors should not allow sympathy to play any role in their deliberations, and thus was permissible.

Our Supreme Court has noted that, "[w]hile the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Luster,* supra, 279 Conn. 429; see also *State* v. *Fernandez,* 169 Conn. App. 855, 869, 153 A.3d 53 (2016) (when prosecutor suggests facts not in evidence, there is risk that jury may conclude he has independent knowledge of fact that could not be presented during trial); *State* v. *Campbell,* 141 Conn. App. 55, 66, 60 A.3d 967 (statements regarding facts that have not been proven amount to unsworn testimony and are not subject of proper closing argument), cert. denied, 308 Conn. 933, 64 A.3d 331 (2013). It also recognized that "closing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial [impropriety], *they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation,*

*will draw that meaning from the plethora of less damaging interpretations.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Luster*, supra, 441.

We conclude that the prosecutor's comment regarding the defendant's in-court behavior was not improper. This remark was made in the context of the prosecutor's proper comments that the jurors were required to put aside any sympathy for the defendant, due to his age, and to decide the case based on the evidence presented. See *State* v. *James E.*, 154 Conn. App. 795, 828, 112 A.3d 791 (2015), aff'd, 327 Conn. 212, 173 A.3d 380 (2017). Further, the challenged comment focused solely on the defendant's good in-court behavior and did not suggest, in any manner, any sort of illicit or untoward out-of-court conduct. We decline to infer the most damaging interpretation of the prosecutor's comment.

The second challenged comment during closing argument occurred during the prosecutor's summary of the narcotics transaction. Specifically, the prosecutor stated: "[Faulkner] believed [that Mikuski and Roig] were about to make a drug deal, purchase drugs. And you know what, he was right. The evidence bears it out because she had the drugs in her hand. Literally, in her hand. She hadn't even put them in her pocket or put in her purse with all the paraphernalia.

"Yes, Sarah Mikuski, she lied. Lied to the police, she stole, she lied to her friend. *She was open and honest* with that. Well, I don't want to use the word honest. It's for you to decide whether she was open and honest. But [defense counsel] thought you could believe her, certainly, when she says—that she stole, that she lied, she lied to her to her friends—she did this, she did that. So she was open about that." (Emphasis added.)

Outside of the presence of the jury, defense counsel objected to the prosecutor's comment that Mikuski was "open and honest." The prosecutor acknowledged that he "inartfully" commented but claimed that it constituted fair argument to defense counsel's comments regarding Mikuski. The court disagreed with the prosecutor that his statement constituted a fair response, but noted that he had corrected it immediately.

"[A] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v.

*Luster*, supra, 279 Conn. 435; see also *State* v. *Williams*, 200 Conn. App. 427, 440, 238 A.3d 797, cert. denied, 335 Conn. 974, 240 A.3d 676 (2020); *State* v. *Jerrell R.*, 187 Conn. App. 537, 553, 202 A.3d 1044, cert. denied, 331 Conn. 918, 204 A.3d 1160 (2019).

Assuming, without deciding, that the prosecutor's "open and honest" comment was improper, we conclude that the defendant failed to establish a deprivation of his due process right to a fair trial. See *State* v. *Papantoniou*, 185 Conn. App. 93, 108, 196 A.3d 839, cert. denied, 330 Conn. 948, 196 A.3d 326 (2018); *State* v. *Aviles*, 154 Conn. App. 470, 486, 106 A.3d 309 (2014), cert. denied, 316 Conn. 903, 111 A.3d 471 (2015); see generally *State* v. *McCoy*, 331 Conn. 561, 571 n.4, 206 A.3d 725 (2019). Considering the *Williams* factors, we conclude that the challenged comment was not severe, was isolated, was corrected by the prosecutor immediately, and was ameliorated by a specific jury charge.[23] We also note that much of Mikuski's testimony was corroborated by other witnesses, namely, Roig and Faulkner. For these reasons, we conclude that the defendant failed to establish a violation of his due process right to a fair trial. Accordingly, his claim of prosecutorial impropriety must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Mikuski testified that, in July, 2017, she was using crack cocaine and heroin.

[2] Mikuski had planned to walk to her mother's home, which was nearby, where she and Roig would then smoke the crack cocaine purchased from the defendant.

[3] Joseph Voytek, a forensic examiner employed by the Department of Emergency Services and Public Protection, testified that he had examined the seized substance and determined that it was cocaine in a rock form and weighed 0.218 grams.

[4] Faulkner stated that crack cocaine was sold at a rate of $10 per tenth of a gram, so that a "30" meant 0.3 grams of crack cocaine and would sell for $30, while 0.2 grams of the narcotic substance, often referred to as a "doub," would sell for $20.

[5] General Statutes § 21a-277 (a) (1) provides in relevant part: "No person may . . . sell . . . dispense . . . offer, give . . . to another person, except as authorized in this chapter, any controlled substance that is (A) a narcotic substance . . . ."

[6] In this e-mail, defense counsel represented to the prosecutor that Pagoni would testify that he had spoken in person with Mikuski at approximately 1 p.m. on March 5, 2018, and that she admitted that (1) on July 13, 2017, she possessed narcotics before meeting with the defendant, (2) she was going to provide the defendant with narcotics, (3) she did not see Faulkner in the unmarked police vehicle prior to meeting with the defendant, (4) she and Roig met the defendant and gave him narcotics, and (5) she and Roig turned around and started walking when Faulkner stopped them. Defense counsel also indicated that Pagoni had not obtained a written statement from Mikuski.

[7] Practice Book § 40-15 provides: "The term 'statement' as used in Sections 40-11, 40-13 and 40-26 means: (1) A written statement made by a person and signed or otherwise adopted or approved by such person; or (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." See also *State* v. *Johnson*, 288 Conn. 236, 277–78, 951 A.2d 1257 (2008).

[8] "The work product rule protects an attorney's interviews, statements,

memoranda, correspondence, briefs, mental impressions, personal beliefs and countless other tangible and intangible items. . . . Work product can be defined as the result of an attorney's activities when those activities have been conducted with a view to pending or anticipated litigation." (Citation omitted; internal quotation marks omitted.) *Ullman* v. *State*, 230 Conn. 698, 714–15, 647 A.2d 324 (1994); see also *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 51 n.17, 730 A.2d 51 (1999) (attorney work product doctrine encompasses work that is essentially result of attorney's activities when conducted with view towards litigation).

[9] Practice Book § 40-13 (b) provides: "Upon written request by the prosecuting authority, filed in accordance with Section 41-5 and without requiring any order of the judicial authority, the defendant, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose to the prosecuting authority the names and, subject to the provisions of subsection (g) of this section, the addresses of all witnesses whom the defendant intends to call in the defendant's case-in-chief *and shall additionally disclose to the prosecuting authority any statements of the witnesses other than the defendant in the possession of the defendant or his or her agents, which statements relate to the subject matter about which each witness will testify*." (Emphasis added.)

[10] Practice Book § 40-5 provides: "If a party fails to comply with disclosure as required under these rules, the opposing party may move the judicial authority for an appropriate order. The judicial authority hearing such a motion may enter such orders and time limitations as it deems appropriate, including, without limitation, one or more of the following: (1) Requiring the noncomplying party to comply; (2) Granting the moving party additional time or a continuance; (3) Relieving the moving party from making a disclosure required by these rules; (4) Prohibiting the noncomplying party from introducing specific evidence; (5) Declaring a mistrial; (6) Dismissing the charges; (7) Imposing appropriate sanctions on the counsel or party, or both, responsible for the noncompliance; or (8) Entering such other order as it deems proper." See also *State* v. *Rabindranauth*, 140 Conn. App. 122, 136, 58 A.3d 361, cert. denied, 308 Conn. 921, 62 A.3d 1134 (2013).

We note that Practice Book § 40-5 vests the trial court with broad discretion to fashion an appropriate remedy for noncompliance with discovery. See *State* v. *Respass*, 256 Conn. 164, 186, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001). "In determining what sanction is appropriate for failure to comply with court ordered discovery, the trial court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances. . . . Suppression of relevant, material and otherwise admissible evidence is a severe sanction which should not be invoked lightly. . . . As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue for us is whether the trial court could have reasonably concluded as it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Cooke*, 134 Conn. App. 573, 578–79, 39 A.3d 1178, cert. denied, 305 Conn. 903, 43 A.3d 662 (2012).

[11] Defense counsel attached a copy of his January 9, 2019 e-mail to the prosecutor to this memorandum of law as Exhibit A. He also attached, as Exhibit B, a copy of the Pagoni memorandum. This memorandum, dated March 5, 2018, stated in part: "On March 5, 2018 at approximately 1300 hrs, this Investigator met [Mikuski] . . . . The interview was conducted away from her home within the Investigator's vehicle, specifically, the Wendy's restaurant parking area . . . .

"In her verbal statement, [Mikuski] stated that she met up with [the defendant] on the day of her arrest, but had the drugs on her already. She stated she walked east on East Main Street with Roig to meet with [the defendant] to provide him some drugs. She stated at the time she did not see the officer or his unmarked vehicle. She stated she and Roig did meet with [the defendant] and gave some drugs to him. They turned around and headed west on East Main Street at which point the officer stopped them.

"When questioned if Roig would support her statement, [Mikuski] stated yes, that he was presently in a rehabilitation facility . . . . When questioned again who had the drugs, she confirmed she had them, not [the defendant].

"When questioned where the police found the drugs on her, she stated they were in her hand at the time she was stopped."

[12] During the jury charge, the court instructed the jury: "Some testimony

has been allowed for a limited purpose. Testimony that was limited to a specific purpose can be considered only as it relates to the limits for which it was allowed, and cannot be considered in finding any other facts as to any other issues.

"Specifically, the testimony offered through Benjamin Pagoni is limited to the purpose of impeaching Sarah Mikuski's testimony that she bought cocaine from the defendant. It is not admissible, and may not be used to find that Sarah Mikuski sold cocaine to the defendant."

[13] Practice Book § 42-53 (a) provides: "Upon motion of the defendant, the judicial authority may grant a new trial if it is required in the interests of justice. Unless the defendant's noncompliance with these rules or with other requirements of law bars him or her asserting the error, the judicial authority shall grant the motion: (1) For an error by reason of which the defendant is constitutionally entitled to a new trial; or (*2*) *For any other error which the defendant can establish was materially injurious to him or her.*" (Emphasis added.) See also *State* v. *McCoy*, 331 Conn. 561, 589–90, 206 A.3d 725 (2019).

[14] As noted previously, the state argued in its appellate brief, in the alternative, that the Pagoni memorandum constituted Pagoni's statement and, therefore, should have been disclosed to the prosecutor. As a result of our conclusion that the defendant failed to establish harm, we need not address the state's alternative argument.

[15] Mikuski stated that, in her experience, sellers of narcotics did not like to text or put things in writing to avoid incriminating themselves.

[16] Faulkner further testified that he had searched Roig and found neither drugs nor money on his person.

[17] During this portion of Pagoni's testimony, defense counsel did not object on the basis of improper opinion testimony. See part II of this opinion.

[18] The defendant subsequently identified these topics in his motion for new trial as follows: "Drug dealers normally do not sell inside their own home and/or apartment . . . . Drug users can get 'dope sick' when they do not have ready access to drugs . . . . Street-level drug addicts are not wealthy . . . . Drug dealers sometimes carry scales to weigh their product . . . . Drug dealers usually have more than one cell phone . . . . Drug dealers typically carry various amount[s] of small denominations of cash . . . . Drug dealers sometimes carry weapons . . . . Drug users usually carry paraphernalia . . . and . . . [a]s between dealers and addicts, the power in the relationship rests with the dealer."

[19] Both our Supreme Court and this court, in the context of a prosecutorial impropriety analysis, have stated: "We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . [The prosecutor's] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and [well established] rules which the laws prescribe." (Internal quotation marks omitted.) *State* v. *A. M.*, 324 Conn. 190, 205, 152 A.3d 49 (2017); *State* v. *Reddick*, 174 Conn. App. 536, 559–60, 166 A.3d 754, cert. denied, 327 Conn. 921, 171 A.3d 58 (2017), cert. denied, U.S. , 138 S. Ct. 1027, 200 L. Ed. 2d 285 (2018); see also *State* v. *Owen*, 331 Conn. 658, 668–69, 207 A.3d 17 (2019) (prosecutors held to higher standard than other attorneys). Because a prosecutor is held to a higher standard of conduct, we note that care must be taken to ensure that the state adheres to both the letter and the spirit of a stipulation entered into with a criminal defendant during a trial.

[20] "Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . In other words, [i]n order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion. . . .

"It is well settled that [t]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury

in determining the questions at issue. . . . Implicit in this standard is the requirement . . . that the expert's knowledge or experience . . . be directly applicable to the matter specifically in issue." *State* v. *Brett B.*, 186 Conn. App. 563, 600–601, 200 A.3d 706 (2018), cert. denied, 330 Conn. 961, 199 A.3d 560 (2019).

[21] See, e.g., *State* v. *Brett B.*, 186 Conn. App. 600, 200 A.3d 706 (2018) (deferential standard of review applies to appellate review of rulings regarding admissibility of expert testimony), cert. denied, 330 Conn. 961, 199 A.3d 560 (2019); *State* v. *Edward M.*, 135 Conn. App. 402, 409, 41 A.3d 1165 (abuse of discretion standard applies to claims regarding scope of cross-examination), cert. denied, 305 Conn. 914, 46 A.3d 172 (2012).

[22] This court has stated: "[T]he appellate harmless error doctrine is rooted in [the] fundamental purpose of our criminal justice system—to convict the guilty and acquit the innocent. The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." (Internal quotation marks omitted.) *State* v. *Maner*, 147 Conn. App. 761, 772, 83 A.3d 1182, cert. denied, 311 Conn. 935, 88 A.3d 550 (2014).

[23] The court instructed the jury: "You are the sole judge of the facts. It is your duty to find the facts. You are to recollect and weigh the evidence and form your own conclusions as to what the ultimate facts are. . . . The law prohibits the [prosecutor] or defense counsel from giving personal opinions as to whether the defendant is guilty or not guilty. It is not their assessment of the credibility of witnesses that matter, only yours. . . . You will decide what the facts are from the evidence that was presented in the court-room. . . .

"Now in deciding what the facts are, you must consider all of the evidence. In doing this, you must decide which testimony to believe and which testimony not to believe. You may believe all, none or part of any witness' testimony. In making that decision, you may take into account a number of factors including the following: Was the witness able to see, or hear, or know the things about which the witness testified? How well was the witness able to recall and describe these things? What was the witness' manner while testifying? Did the witness have an interest in the outcome of the case or any bias or prejudice concerning any party or any matter involved in the case? Was the witness' testimony contradicted by what the witness has said or done at any time, or by the testimony of other witnesses, or by other evidence?

"If you should think that a witness has testified falsely in some respect, you should carefully consider whether you should rely upon any of his or her testimony. . . .

"Now in weighing the testimony of an accomplice who is a self-confessed criminal, you should consider that fact. It may be that you would not believe a person who had committed a crime as readily as you would believe a person of good character. In weighing the testimony of an accomplice who has not yet been sentence or whose case had not yet been disposed of or who has not been charged with offenses in which the state has evidence, you should keep in mind that she may in her own mind be looking for some favorable treatment in the sentence or disposition of her own case or hoping not to be arrested. Therefore, she may have such an interest in the outcome of this case that her testimony may have been colored by the fact. Therefore, you must look with particular care at the testimony of an accomplice and scrutinize it very carefully before you accept it.

"There are many offenses that are of such a character that the only person capable of giving useful testimony are those who are themselves implicated in the crime. It is for you to decide what credibility you will give to a witness who has admitted her involvement in criminal wrongdoing, whether you will believe or disbelieve the testimony of a person who by her own admission had committed or contributed to the crime charge by the state here. Like all other questions of credibility, this is a question you must decide based on all the evidence presented to you."