******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* JOHN A. MASSARO
## (SC 20653)

Robinson, C. J., and McDonald, D'Auria,
Mullins and Ecker, Js.

*Syllabus*

Convicted of the crime of the sale of a narcotic substance, the defendant appealed. F, a police officer, had observed M and her boyfriend, R, engage in what F believed to be a hand-to-hand narcotic transaction with the defendant. After the transaction, F confronted M and R, and M surrendered the cocaine that she was holding in her hand. M also emptied her purse, which contained drug paraphernalia used to smoke cocaine. At the defendant's trial, M testified that she had bought cocaine from the defendant. On cross-examination, M denied that she told the defense's private investigator, P, that she had provided drugs to the defendant on the day in question. After the state rested its case, defense counsel notified the trial court that he would be calling P to testify regarding M's prior oral inconsistent statement. Defense counsel sought to introduce, but failed to disclose to the state, a memorandum P created after meeting with M months after the alleged drug sale but prior to trial. In that memorandum, P memorialized that, when he interviewed M, she admitted that she had given the defendant drugs. The trial court sanctioned the defendant for the failure to timely disclose the memorandum to the state by precluding him from admitting it as evidence. The defendant appealed from the judgment of conviction to the Appellate Court, claiming that the trial court had improperly imposed a discovery sanction precluding the admission of P's memorandum and had improperly permitted the prosecutor to elicit expert opinion testimony from P during cross-examination when P had been neither offered nor qualified as an expert witness. The Appellate Court concluded that any error was harmless and affirmed the judgment of conviction. On the granting of certification, the defendant appealed to this court. *Held*:

1. The Appellate Court correctly concluded that the trial court's improper discovery sanction precluding the admission of P's memorandum was harmless:

   The jury was presented with substantial, independent evidence, including physical evidence and testimony, demonstrating that the defendant had sold cocaine to M, and, therefore, this case did not turn on a credibility contest between M and P, as the defendant claimed.

   Moreover, although the trial court precluded the admission of P's memorandum, defense counsel nevertheless was able to challenge M's credibility on the basis of her prior, allegedly inconsistent statement to P and had ample opportunity to cross-examine witnesses and challenge physical evidence that was contrary to the defense's theory that M had given drugs to the defendant.

   Furthermore, the state presented a strong case, as it introduced incriminating statements from M and R that they had met with the defendant to purchase drugs and that M had purchased drugs from the defendant; physical evidence, including recovered narcotics, drug paraphernalia and text messages between M and the defendant indicating M's request to purchase from the defendant; and eyewitness testimony from F confirming M's and R's testimony regarding the hand-to-hand exchange with the defendant and their interaction with the police immediately thereafter.

   In addition, the excluded evidence was of questionable reliability, as P admitted that, when he interviewed M, she was under the influence of what he believed to be heroin, and P did not record M's statement or ask M for a written and sworn statement.

   Accordingly, the improper exclusion of P's memorandum did not substantially sway the jury's verdict.

2. The Appellate Court correctly concluded that any error in allowing the

prosecutor, during cross-examination of P, to convert him into an expert witness regarding the general characteristics of the narcotics trade was harmless:

Although the prosecutor's cross-examination of P regarding the general characteristics of the narcotics trade may have bolstered M's testimony that she was the buyer and, in turn, diminished the importance of P's testimony in the defendant's case, the significance of P's testimony to the defendant's case was that M told P that she had given the defendant drugs, and the prosecutor's questions about the general characteristics of the narcotics trade did not prevent the admission of or undermine P's testimony about what M had told him.

Moreover, P's testimony about the general characteristics of the narcotics trade was largely cumulative of the testimony of M, R and F, P gave the jury reason to believe that he could not be relied on as an expert in the narcotics trade, as some of his answers to the prosecutor's questions did not weigh in the state's favor or reveal that he had extensive knowledge of the narcotics trade, some of P's testimony on cross-examination supported the defense's theory that M was the drug dealer, and the state's case against the defendant was strong.

Accordingly, the defendant did not meet his burden of proving that any error in allowing the prosecutor to convert P into an expert witness substantially swayed the jury's verdict.

Argued December 14, 2022—officially released July 11, 2023

*Procedural History*

Substitute information charging the defendant with the crime of sale of narcotics, brought to the Superior Court in the judicial district of Litchfield, geographical area number eighteen, and tried to the jury before *Danaher, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *Moll*, *Alexander* and *DiPentima, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, was *David R. Shannon*, state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. After a trial, a jury found the defendant, John A. Massaro, guilty of the sale of a narcotic substance in violation of General Statutes (Rev. to 2017) § 21a-277 (a). The trial court rendered a judgment of conviction in accordance with the jury's verdict and imposed a total effective sentence of ten years of imprisonment, execution suspended after six years, followed by five years of probation.

The defendant appealed to the Appellate Court, raising three claims, two of which are relevant to this appeal. See *State* v. *Massaro*, 205 Conn. App. 687, 690, 258 A.3d 735 (2021). First, he claimed that the trial court erred in imposing a discovery sanction precluding the admission of a written memorandum that contained the inconsistent statement of one of the state's main witnesses. See id., 692–93. Second, he claimed that the trial court erred in permitting the prosecutor to elicit expert opinion testimony on cross-examination of defense counsel's private investigator, Benjamin Pagoni, who had been neither offered nor qualified as an expert witness. See id., 704. The Appellate Court agreed with the parties that the discovery sanction was improper, but it concluded that such error was harmless. See id., 699, 701. Likewise, with regard to the second issue, the Appellate Court concluded that the cross-examination of Pagoni, even if improper, was also harmless. See id., 704, 707. As a result, the Appellate Court affirmed the judgment of conviction. Id., 690, 718. We thereafter granted the defendant's petition for certification to appeal.[1] In this appeal, the defendant asserts that the Appellate Court's judgment must be reversed because any errors related to the improper discovery sanction and expert testimony were harmful. We disagree. Accordingly, we affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have found. "On July 13, 2017, Matthew Faulkner, a Torrington police officer assigned to the narcotics division, was on duty when he observed two known narcotics users, Sarah Mikuski[2] and her boyfriend, Anthony Roig, walking on East Main Street. Faulkner then saw the defendant approaching Mikuski and Roig. Faulkner continued his surveillance of these individuals and watched as the defendant exchanged 'something' with Mikuski. After this brief exchange, the defendant travelled in an opposite direction away from Mikuski and Roig.[3] Believing that a 'hand-to-hand' illegal narcotic transaction had just occurred, [Faulkner followed Mikuski and Roig because he believed they had received an illegal narcotic substance from the defendant.] Faulkner called for assistance, requesting that the responding officer intercept the defendant before he returned to his residence. The police, however, were unable to locate the de-

fendant that day.

"Faulkner approached Mikuski and Roig. He instructed Mikuski to surrender the item that the defendant had given her. She complied and placed a small, clear plastic bag containing a white powdery substance, later determined to be . . . cocaine, on the wall next to them. Mikuski also emptied her purse, which contained an assortment of used drug paraphernalia, including empty wax packets, needles, crack pipes containing a burnt residue, and Brillo pads used to filter . . . cocaine when it is smoked. Mikuski admitted [to Faulkner] that she handed the defendant a cigarette packet with $26 tucked inside it and purchased $30 worth of . . . cocaine from the defendant.[4] Mikuski also admitted that she had purchased illegal substances from the defendant in the past. Mikuski did not have any other illegal substances or cash in her possession."[5] (Footnote altered; footnotes in original; footnote omitted.) Id., 690–91.

Additional facts and procedural history will be set forth as necessary.

I

The first issue on appeal is related to the trial court's improper discovery sanction. This claim arises from the fact that, when the defense disclosed Pagoni as a witness who would testify at trial, defense counsel failed to disclose to the state a memorandum Pagoni created after meeting with Mikuski. In that memorandum, Pagoni memorialized that, when he interviewed Mikuski prior to trial, she stated that she was the one who gave the drugs to the defendant. Because this memorandum was not timely disclosed to the state, the trial court sanctioned the defendant by precluding him from admitting the memorandum as evidence. We now address whether the Appellate Court correctly concluded that the trial court's improper sanction was harmless. The following facts are relevant to this claim.

Before trial began, the state filed a motion, pursuant to Practice Book §§ 40-7, 40-13, 40-18 and 40-27, "requesting that the defendant disclose any statements of the witnesses other than the defendant in his possession or in the possession of an agent of the defendant which statement relates to the subject matter about which such witness will testify . . . ." (Internal quotation marks omitted.) Id., 692. Defense counsel disclosed the defendant and Pagoni as potential witnesses but disclosed no statements. See id.

At trial, the state called Mikuski to testify.[6] She testified that, around the time of this incident, she was addicted to heroin and cocaine, and, on the day in question, she bought cocaine from the defendant. On cross-examination, Mikuski testified that, prior to trial, she met and had spoken with Pagoni. Defense counsel asked Mikuski if she had told Pagoni during their meet-

ing that she had drugs on her prior to meeting the defendant and that she was the one who provided drugs to the defendant. Mikuski denied ever saying that to Pagoni.

After the state rested its case, defense counsel notified the trial court that he would be calling Pagoni to testify regarding a prior oral inconsistent statement of Mikuski. As an offer of proof, defense counsel stated that Pagoni would testify that Mikuski had told him that she was carrying narcotics on her person prior to meeting with the defendant on July 13, 2017, and that she gave narcotics to the defendant prior to her arrest. Defense counsel represented that he had communicated this information via email to the prosecutor the day before. Defense counsel mentioned that Pagoni had provided him with a memorandum detailing his conversation with Mikuski and that this memorandum had been in counsel's possession since approximately March 12, 2018.[7]

The prosecutor objected to the introduction of the memorandum and argued that Pagoni's memorandum was inadmissible because it was a statement of a trial witness in defense counsel's possession that had not been disclosed to the state and thereby constituted a violation of the rules of discovery, specifically, Practice Book § 40-15 (2).[8] The trial court inquired whether defense counsel had provided Pagoni's memorandum to the state. He replied in the negative, indicating that, in his view, this document constituted protected attorney work product and, thus, was exempt from disclosure. The trial court rejected defense counsel's position and held that the memorandum was a statement by Mikuski and should have been disclosed pursuant to Practice Book §§ 40-13 (b)[9] and 40-15 (2).[10] Consequently, the trial court sanctioned the defendant by precluding him from introducing Pagoni's memorandum, stating that "evidence . . . as to the existence of that written statement is not admissible, and it will not be the subject of testimony by Pagoni or questioning by any attorney or argument by any attorney." The trial court concluded that the testimony of Pagoni, if permitted, would be limited to impeaching Mikuski's testimony that she had purchased the cocaine from the defendant and could not be used for the purpose of establishing that she had sold it to him.[11]

Defense counsel then called Pagoni as a witness. Pagoni testified that he had met with Mikuski on March 5, 2018, and drove her to a nearby Wendy's restaurant. They ordered food and spoke for approximately ten minutes. He testified that, during their meeting, Mikuski told him that she had provided narcotics to the defendant on July 13, 2017.

On cross-examination, the prosecutor inquired about the circumstances of the interview. Pagoni testified that Mikuski appeared to be under the influence of a drug,

most likely heroin. He acknowledged that people under the influence of drugs tend to be less accurate. He testified that he did not record Mikuski's statement or take a written, signed statement under oath, despite his extensive training as a state trooper teaching him that doing so is the best way to ensure the accuracy and truth of a statement. Pagoni acknowledged that he had not asked Mikuski whether she had purchased narcotics from the defendant in the past or why she would have given narcotics to the defendant. He testified that he never interviewed Roig to verify any of Mikuski's statements.

Pagoni was also asked how many hours he had worked on this case. Pagoni replied that he was uncertain. The prosecutor then asked: "So, as you sit here today, you remember specifically what . . . Mikuski said to you, but you can't remember—you can't even approximat[e]—how many hours you worked on the case?" Pagoni, referring to his memorandum, answered: "I can remember what . . . Mikuski said to me because it's written down." The prosecutor objected on the ground that Pagoni's answer was nonresponsive.[12] The trial court subsequently instructed the jury to disregard any reference in Pagoni's testimony to a written memorandum.

After the cross-examination resumed, the prosecutor asked Pagoni whether defense counsel discussed with him what other witnesses had said in court just one day prior. Pagoni said "I don't know," "I don't recall," and then, "I have no recollection of him talking to me about [what witnesses said in court]." Subsequently, Pagoni was asked, "[d]o you have any problems with your memory?" Pagoni answered, "[w]ell, as [I] approach seventy, yes, I do." Pagoni then proceeded to give conflicting testimony regarding how long his interview with Mikuski lasted. Initially, he testified that he met with Mikuski for approximately ten minutes. After being questioned about his memory, Pagoni testified that he met with Mikuski for a total of around fifteen minutes, and, when asked again, he changed his answer and said the meeting was around thirty-five minutes long.

In the Appellate Court, the defendant "claim[ed] that the [trial] court abused its discretion when it determined that defense counsel had violated discovery rules and by imposing a sanction as a result of that violation." *State* v. *Massaro*, supra, 205 Conn. App. 692. The Appellate Court agreed that "the trial court [incorrectly had] determined that the Pagoni memorandum constituted Mikuski's statement"; however, it concluded that the evidentiary error and the resulting sanction were harmless. Id., 701.

On appeal to this court, the defendant claims that the improper preclusion of Pagoni's memorandum substantially swayed the jury's verdict, rendering the trial

court's error harmful. Specifically, the defendant asserts that, because Pagoni was unable to verify, with his written recollection, that Mikuski told him that she had provided drugs to the defendant, Pagoni's testimony was undermined, and the defense was weakened in a manner that substantially swayed the jury's verdict. The defendant also claims that the trial court's ruling prohibiting him from admitting the memorandum into evidence made Pagoni appear to have selective memory, and, as a result, it bolstered Mikuski's testimony.

Our review of the record assures us that, although the error was not insignificant to the defendant's case, ultimately, the error was harmless. The defendant argues that Pagoni's memorandum was direct evidence to support his theory that Mikuski gave drugs to the defendant, and that the court's error was magnified because the case turned on this credibility contest between Mikuski and Pagoni. We are mindful that, if this case presented the jury purely with a credibility contest characterized by equivocal evidence, then "an error affecting the jury's ability to assess a [witness'] credibility is not harmless error." (Internal quotation marks omitted.) *State* v. *Fernando V.*, 331 Conn. 201, 223–24, 202 A.3d 350 (2019); see, e.g., id., 203, 215–16, 224 (concluding that exclusion of testimony in child sexual assault case was improper and not harmless because state's case was not exceedingly strong considering absence of physical evidence). Here, however, the case was not solely "a credibility contest characterized by equivocal evidence . . . ." (Internal quotation marks omitted.) Id., 215. Indeed, the jury was presented with substantial, independent physical and eyewitness testimonial evidence establishing that the defendant had sold cocaine to Mikuski, allowing the jury to return a verdict that was not contingent on a credibility contest. Accordingly, we conclude that the improper exclusion of Pagoni's memorandum did not substantially sway the jury's verdict and render the trial court's error harmful.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Favoccia*, 306 Conn. 770, 808, 51 A.3d 1002 (2012); see, e.g., *State* v. *Cavell*, 235 Conn. 711, 721, 670 A.2d 261 (1996) (improper discovery sanction was nonconstitutional in nature, and, therefore, defendant bore burden of proving harm). It is well settled that "[w]hether [an improper evidentiary ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the [defendant's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . .

evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error." (Internal quotation marks omitted.) *State* v. *Qayyum*, 344 Conn. 302, 316, 279 A.3d 172 (2022). "Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Favoccia*, supra, 809.

Pagoni's primary importance to the defendant was that, nearly eight months after the drug sale, Mikuski told Pagoni, during their meeting, that she gave the drugs to the defendant. Pagoni was able to testify to that. At trial, Pagoni testified that Mikuski had told him "that she was walking . . . with . . . Roig and that . . . she met the defendant, and they made an exchange. And that [Mikuski] was the one [who] gave [the defendant] the drugs." On cross-examination, in response to different questions asked by the prosecutor, Pagoni affirmed several times that Mikuski told him that she "gave [the defendant] drugs . . . ." Thus, although the trial court precluded admission of the memorandum, the defendant was able to challenge Mikuski's credibility on the basis of her prior, allegedly inconsistent statement to Pagoni.

The defendant contends that, without the memorandum, Pagoni appeared to have selective memory because he could remember what Mikuski told him but not, in response to the prosecutor's question, how many hours he worked on the case. This argument carries some force. Indeed, after admitting that he could not recall whether defense counsel talked to him about what witnesses had said in court just one day prior, Pagoni also admitted that, as he approached seventy years of age, he had problems with his memory. He then proceeded to give conflicting accounts of how long his meeting with Mikuski lasted, ranging from ten minutes to more than one-half hour. In light of this testimony, we can appreciate that the memorandum would have bolstered Pagoni's credibility and strengthened his testimony. It was evidence recorded prior to trial suggesting that Mikuski had provided the drugs to the defendant. The defendant's inability to present this evidence makes the harmless error determination a closer question. However, after assessing the other harmless error factors, the other testimonial, as well as physical, evidence considered by the jury, and, most important, the overall strength of the state's case, we are confident that the defendant has not met his burden of proving that the trial court's improper exclusion of the memorandum substantially swayed the jury's verdict.

We recognize that the state presented a strong case. See, e.g., 3B C. Wright et al., Federal Practice and Procedure (4th Ed. 2013) § 854, p. 507 ("[p]erhaps the single

most significant factor in weighing whether an error was harmful . . . is the strength of the case against the defendant"). At trial, the state introduced (1) incriminating statements from Mikuski and Roig that they met with the defendant to purchase drugs and that Mikuski did purchase drugs, (2) physical evidence, including recovered narcotics, drug paraphernalia and text messages between Mikuski and the defendant, and (3) eyewitness testimony from Officer Faulkner confirming Mikuski's and Roig's testimony regarding their hand-to-hand exchange with the defendant and interaction with the police immediately thereafter.

Mikuski testified at trial that she was a daily user of cocaine and heroin and that she had previously bought drugs from the defendant. She testified that, on the day in question, she contacted the defendant via text message and asked him if he would "do a 30 for $26 . . . ." They agreed to meet by the stone wall near his apartment building. When they met, she gave him a cigarette package with $26 in it, and he gave her a baggie of cocaine.

On cross-examination, defense counsel asked Mikuski if she told Pagoni that she had given drugs to the defendant. Mikuski responded, while under oath, that the assertion was not true and denied telling Pagoni as much. Defense counsel also asked Mikuski if she told Pagoni that she had drugs on her before meeting the defendant. Mikuski responded, "[n]o." She further stated that she used any income to buy drugs and that her only income derived from shoplifting items and then returning them with receipts that were thrown away.

Roig testified at trial and corroborated Mikuski's testimony. Roig testified that, on the day of the transaction, he and Mikuski planned to get drugs and immediately consume them. Roig testified that Mikuski had no drugs on her before walking up the hill to meet with someone. Roig also provided the state with a sworn statement a few days before his testimony in which he said, "I went with [Mikuski] to the area of, I think, East Main Street, Torrington . . . so she could buy crack from someone . . . and [Mikuski bought] the crack from him. I don't know how much [Mikuski] paid for the crack or how much crack she got." When asked at trial whether he actually saw a transaction, Roig, who was nearby when the exchange occurred, testified that "there had to be a transaction" because Mikuski had money before meeting with the man, but, when she returned to Roig, she only had drugs that she did not possess beforehand. Roig further testified that the person Mikuski *bought* drugs from was an older male with gray hair—a physical description matching the defendant's description.

Both Roig's and Mikuski's testimony was corroborated by Officer Faulkner's recollection of events. Specifically, Faulkner testified that he knew that Mikuski and Roig were heavy drug users. Faulkner testified that

he observed a quick hand-to-hand transaction in which, he believed, the defendant gave Mikuski "product." Faulkner testified that he kept a visual on Mikuski and Roig from the time of the transaction to the point in time that he recovered narcotics from Mikuski and that he "never lost sight of [Mikuski] or [Roig]." He then followed Mikuski and Roig, and confronted them, demanding that Mikuski give him what the defendant had given her. According to Faulkner, Mikuski opened the same hand involved in the hand-to-hand transaction with the defendant and placed the cocaine that she was holding in that hand on top of the nearby wall.

The testimony provided by the state's witnesses was also corroborated by physical evidence recovered in this case. When the police apprehended Mikuski, they recovered 0.218 grams of cocaine, all of which Mikuski had been holding in her hand when Faulkner stopped her.[13] The police also recovered drug paraphernalia on Mikuski's person, including crack pipes with burnt residue and steel wool pads.[14] Notably absent from the police search of Mikuski and Roig was any money, which contradicts the theory that the defendant paid Mikuski for cocaine.[15] The fact that Mikuski possessed drugs but not money supports Roig's testimony and his statement to the police that Mikuski had money before meeting with the defendant and intended to use the money to buy cocaine that she did not possess prior to meeting the defendant. The physical evidence also corroborates Faulkner's testimony that he saw Mikuski take something from the defendant with the hand that she revealed, moments later, to be holding cocaine.

Furthermore, the state presented evidence of text messages between Mikuski and the defendant. Most relevant were text messages that Mikuski sent to the defendant, asking if he would "do a 30 for $26" and where he wanted to meet. Viewed in context and considering that Mikuski was arrested moments after the transaction with only cocaine and no money on her person, these texts tend to suggest that Mikuski was asking to buy a "30," or 0.3 grams of cocaine, as Faulkner testified, for $26. If it were the other way around, and Mikuski was the seller, as the defendant asserts, it makes little sense that Mikuski and Roig would possess cocaine but not money *after* their exchange with the defendant.

One of the factors we consider in assessing the impact of the excluded evidence on the jury is the extent of cross-examination otherwise permitted. See, e.g., *State v. Qayyum*, supra, 344 Conn. 316. In the present case, we note that defense counsel had ample opportunity to cross-examine witnesses and to challenge physical evidence that was contrary to the defense's theory that Mikuski had given drugs to the defendant. Besides asking Mikuski, while she was under oath, if she gave or sold drugs to the defendant, which she answered in the

negative, defense counsel was also able to challenge her credibility by attempting to show that she had a motive to deny being the seller because her testimony in this case was part of the plea agreement to sale of narcotics in an unrelated case. Defense counsel also cross-examined Roig, who was subpoenaed to testify in court, and asked him whether he felt forced to provide the police with a written statement before trial stating that Mikuski bought drugs moments before she and Roig were apprehended by Faulkner. Roig answered, "I don't feel like I was forced to do that . . . ."

Finally, we consider the quality of the excluded evidence. The circumstances under which Pagoni secured the excluded memorandum were questionable. Indeed, Pagoni himself admitted that, when he interviewed Mikuski, she was under the influence of what he believed to be heroin. He told the jury that people under the influence tend to be less accurate than sober people. Pagoni also told the jury that, although recordings or written and sworn statements are typically the best evidence, he did not record Mikuski's statement or ask Mikuski for a written and sworn statement. Thus, even if the memorandum had been admitted into evidence, given the inadequacies of the interview, the jury would still have had reason to question the accuracy of what Mikuski allegedly told Pagoni.

On the basis of the foregoing, considering the excluded memorandum in juxtaposition with the nature and quality of the evidence that was admitted, we have a fair assurance that the trial court's ruling did not substantially affect the verdict. The state's case was strong. It consisted of independent evidence, separate from Mikuski's testimony, demonstrating that the defendant was the seller and that the excluded evidence was of questionable reliability. Furthermore, despite the preclusion of Pagoni's written memorandum, Pagoni was able to impeach Mikuski by testifying that she told him she had given drugs to the defendant. Ultimately, we agree with the Appellate Court that any error by the trial court in precluding Pagoni's memorandum was harmless.

## II

The defendant next claims that the Appellate Court incorrectly concluded that any error in allowing the prosecutor to convert Pagoni into an expert witness regarding the narcotics trade during cross-examination was harmless. The defendant contends that Pagoni's expert testimony about the general characteristics of narcotics dealers bolstered Mikuski's testimony and credibility, and, therefore, the jury was substantially swayed by it. The state responds that questions about the general characteristics of the narcotics trade did not substantially sway the jury's verdict because the importance of Pagoni's testimony was diminished by

all of the other evidence, which independently showed that Mikuski was the buyer and, thus, that her statements were credible.

The opinion of the Appellate Court sets forth the following additional facts necessary for our consideration of this claim. "During the trial, the defense called Pagoni as a witness. He stated that he had been a Connecticut state trooper for approximately thirty-four years and that in his career he had worked in a variety of assignments, including the narcotics division. During cross-examination, the prosecutor asked if people who possessed drugs normally carried them in their hands while walking down the street. The [trial] court overruled an objection based on speculation, and Pagoni responded that sometimes that does, in fact, occur. . . .

"After the cross-examination addressed other topics, the prosecutor asked Pagoni whether drug dealers generally prefer not to conduct sales inside their homes or apartments. Defense counsel objected, arguing that it called for speculation and improper opinion testimony, as Pagoni had not been offered as an expert witness.[16] The [trial] court overruled the objection, stating that defense counsel had questioned Pagoni about his law enforcement background on direct examination. The prosecutor then asked a series of questions regarding the sale and use of drugs." (Footnote added.) *State* v. *Massaro*, supra, 205 Conn. App. 704–705.

Defense counsel again objected, this time to the entire line of questioning, and that objection also was overruled.[17] After trial, the defendant filed a motion for a new trial. In that motion, he challenged the following topics that Pagoni was questioned about: (1) drug dealers do not sell in their homes, (2) drug users become " 'dope sick' " if they are unable to obtain drugs for some period of time, (3) street level addicts are not wealthy, (4) dealers sometimes carry scales, more than one cell phone, cash in various small denominations, and weapons to protect themselves, (5) users carry drug paraphernalia such as crack pipes and a "Chore Boy" to smoke cocaine and needles to inject heroin, and (6) the power lies with the dealer in a dealer/addict relationship.[18]

The Appellate Court assumed that the trial court's evidentiary rulings regarding the prosecutor's cross-examination of Pagoni constituted an abuse of discretion but concluded that any such error was harmless. *State* v. *Massaro*, supra, 205 Conn. App. 707. The Appellate Court reasoned that the jury's verdict was not substantially swayed given the testimony of Faulkner, Mikuski, and Roig, and the accompanying evidence, particularly the text message from Mikuski to the defendant, asking, "[h]ey u do a 30 for $26?" (Internal quotation marks omitted.) Id., 702; see also id., 708. After reviewing the record in the present case, we agree with the Appellate Court that, even if the trial court's rulings

were improper, the admission of Pagoni's testimony regarding the general characteristics of the narcotics trade was not harmful.

"If we determine that a court acted improperly with respect to the admissibility of expert testimony, we will reverse the trial court's judgment and grant a new trial only if the impropriety was harmful to the appealing party." (Internal quotation marks omitted.) *State* v. *Edwards*, 325 Conn. 97, 123, 156 A.3d 506 (2017); see also, e.g., id., 133–34 (concluding that improper admission of expert testimony was harmless). In part I of this opinion, we outlined the factors that we consider in determining whether an erroneous evidentiary ruling substantially swayed a jury's verdict. See, e.g., *State* v. *Qayyum*, supra, 344 Conn. 316; see also, e.g., *State* v. *Edwards*, supra, 133. We consider those factors as they relate to the defendant's claim.

First, we acknowledge that the prosecutor's cross-examination of Pagoni, regarding the general characteristics of the narcotics trade, may have bolstered Mikuski's testimony that she was the buyer and, in turn, diminished the importance of Pagoni's testimony in the defendant's case. However, as we previously explained in this opinion, in light of the defendant's theory of the case, the significance of Pagoni's testimony to the defendant's case was that Mikuski told Pagoni that she had given drugs to the defendant. The prosecutor's questions about the general characteristics of the narcotics trade did not prevent the admission of or undermine Pagoni's testimony about what Mikuski had told him. During closing arguments, the prosecutor referenced only one relevant portion of Pagoni's testimony as it related to the general characteristics of the narcotics trade, stating that "the defense's own witness agreed with . . . the state . . . [that the drug dealer] generally holds the power in this situation . . . [over] the addict."

Second, Pagoni's testimony about the general characteristics of the narcotics trade was largely cumulative of other evidence. Indeed, Faulkner, Mikuski, and Roig testified about many of the same characteristics of drug dealers to which Pagoni testified. Specifically, Faulkner testified that the stone wall in front of the church where Mikuski and the defendant met is a common location used to facilitate drug deals, signaling to the jury that drug transactions typically happen outside of the dealer's home. Mikuski explained that addicts become "dope sick" when withdrawing from heroin. Roig testified that drug users often do not hold onto drugs for very long, using them "[v]ery soon after getting them . . . ."

Third, Pagoni gave the jury reason to believe that he could not be relied on as an expert in the narcotics trade. Indeed, Pagoni's answers to the prosecutor's questions about the general characteristics of drug dealers did not all weigh in the state's favor or reveal that

he had extensive knowledge in the area. For instance, Pagoni did not know whether cocaine is generally sold in $10 increments or the term "Chore Boy . . . ." If these are actual characteristics of narcotics dealers that the state wished to prove, Pagoni did not do so. Pagoni also rebutted the prosecutor's assumption that dealers carry scales or weapons, stating that very rarely do dealers carry scales and that he is aware of very few dealers who carry weapons. Pagoni's testimony regarding these facts actually lends support to the *defendant's* theory that Mikuski was the dealer considering that the police did not recover any scale or weapon from her person.

Fourth, as analyzed in part I of this opinion, the state's case was strong. Specifically, the state introduced testimonial and physical evidence supporting the conclusion that the defendant had sold Mikuski the narcotics. Mikuski testified and admitted that she had paid the defendant and received cocaine in exchange. The state introduced evidence of texts between Mikuski and the defendant in which she asked him whether he can "do a 30 for $26 . . . ." When stopped by the police moments after making a transaction with the defendant, Mikuski was apprehended with more than two tenths of a gram of cocaine in her hand and paraphernalia used to smoke cocaine on her person, but the police did not find any money. This essentially confirms that Mikuski's text to the defendant was a request to buy drugs from him. The testimony of Faulkner and Roig also confirmed that Mikuski had engaged in a transaction with the defendant to purchase cocaine.

Thus, because Pagoni's responses to the challenged topics did not all weigh in the state's favor and the state's case was strong, the defendant has not met his burden of proving that any error by the trial court in allowing the prosecutor to convert Pagoni into an expert witness substantially swayed the jury's verdict. Accordingly, we agree with the Appellate Court that allowing Pagoni to testify regarding the general characteristics of the narcotics trade, even if improper, was harmless.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] We granted the defendant's petition for certification to appeal, limited to the following issues: "(1) Did the Appellate Court correctly conclude that any sanction the trial court improperly imposed on counsel for violating discovery rules was harmless?" And "(2) [e]ven if, as the Appellate Court assumed, the trial court's rulings on the [prosecutor's] cross-examination of the defendant's investigator improperly permitted the prosecutor to convert him into an expert witness regarding the narcotics trade after the parties had agreed not to present expert testimony on that topic, did the Appellate Court correctly conclude that any such error was harmless?" *State* v. *Massaro*, 340 Conn. 908, 264 A.3d 1001 (2021). As these questions demonstrate, we do not address the Appellate Court's conclusions with respect to whether the trial court's rulings on these evidentiary claims were erroneous. In this appeal, we address only the question of harm as reflected in the two certified questions.

[2] Mikuski testified that, at the time of the transaction with the defendant, she was using cocaine or heroin. She also admitted that, during this time,

she was not working and stole money for the purpose of using drugs daily, namely, heroin and cocaine.

[3] "Mikuski had planned to walk to her mother's home, which was nearby, where she and Roig [intended to] smoke the . . . cocaine purchased from the defendant." *State* v. *Massaro*, supra, 205 Conn. App. 691 n.2.

[4] "Faulkner stated that . . . cocaine was sold at a rate of $10 per one tenth of a gram, so that a '30' meant 0.3 grams of . . . cocaine and would sell for $30, [whereas] 0.2 grams of the narcotic substance, often referred to as a 'doub,' would sell for $20." *State* v. *Massaro*, supra, 205 Conn. App. 691 n.4.

[5] Mikuski was arrested and charged with possession of narcotics.

[6] At the time of the defendant's trial, Mikuski had pleaded guilty to, but had not yet been sentenced for, the sale of narcotics in a matter unrelated to this case. In exchange for that plea and providing truthful, sworn testimony in the present case, Mikuski reached an agreement with the state that her maximum exposure would be a sentence of five years of imprisonment, execution suspended after twelve months, followed by a three year period of probation. Per the agreement, the ultimate decision regarding her sentence would be made by the sentencing judge.

[7] The record reflects that the memorandum was sent to defense counsel on or around March 12, 2018, about seven days after Pagoni interviewed Mikuski. This memorandum stated in relevant part: "On March 5, 2018, at approximately 1300 [hours], this [i]nvestigator met [Mikuski] . . . . The interview was conducted away from her home, within the [i]nvestigator's vehicle, specifically the Wendy's restaurant parking area . . . .

"In her verbal statement, [Mikuski] stated that she met up with [the defendant] on the day of her arrest, but [she] had the drugs on her already. She stated she walked east on East Main Street with Roig to meet with [the defendant] to provide him some drugs. She stated at the time she did not see the officer or his unmarked vehicle. She stated she and Roig did meet with [the defendant] and gave some drugs to him. They turned around and headed west on East Main Street, at which point the officer stopped them.

"When questioned if Roig would support her statement, [Mikuski] said yes, that he was presently in a rehabilitation facility . . . . When questioned again who had the drugs, she confirmed she had them, not [the defendant].

"When questioned where the police found the drugs on her, she stated they were in her hand at the time she was stopped."

[8] Practice Book § 40-15 provides: "The term 'statement' as used in Sections 40-11, 40-13 and 40-26 means:

"(1) A written statement made by a person and signed or otherwise adopted or approved by such person; or

"(2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement."

[9] Practice Book § 40-13 (b) provides in relevant part: "Upon written request by the prosecuting authority . . . the defendant . . . *shall* . . . *disclose to the prosecuting authority any statements of the witnesses other than the defendant in the possession of the defendant or his or her agents, which statements relate to the subject matter about which each witness will testify.*" (Emphasis added.)

[10] Pursuant to Practice Book § 40-15, the trial court determined that Pagoni's memorandum constituted a substantially verbatim recital of Mikuski's oral statement that had been recorded sufficiently contemporaneously. *State* v. *Massaro*, supra, 205 Conn. App. 696. As a result, the trial court "ordered defense counsel to provide the prosecutor with a redacted copy of the Pagoni memorandum and to make Pagoni available for questioning." Id., 694–95.

[11] The trial court instructed the jury in relevant part: "Some testimony has been allowed for a limited purpose. Testimony that was limited to a specific purpose can be considered only as it relates to the limits for which it was allowed and cannot be considered in finding any other facts as to any other issue. Specifically, the testimony offered through . . . Pagoni is limited to the purpose of impeaching . . . Mikuski's testimony that she bought cocaine from the defendant. It is not admissible and may not be used to find that . . . Mikuski sold cocaine to the defendant." We note that the memorandum did not state that Mikuski *sold* the defendant drugs; rather, it stated that she *gave* the defendant drugs. See footnote 7 of this opinion.

[12] "The [trial] court excused the jury and reminded counsel that, during conversations in chambers and on the record, it had indicated that the Pagoni memorandum would not [be admitted] into evidence. The court then

admonished Pagoni and directed him to refrain from mentioning that he had written down or memorialized Mikuski's statements during his testimony." *State* v. *Massaro*, supra, 205 Conn. App. 697.

[13] "Joseph Voytek, a forensic examiner employed by the Department of Emergency Services and Public Protection, testified that he had examined the seized substance and determined that it was cocaine in a rock form and weighed 0.218 grams." *State* v. *Massaro*, supra, 205 Conn. App. 691 n.3.

[14] At trial, Faulkner and Mikuski testified that the crack pipes and steel wool pads were used to smoke cocaine.

[15] The defendant surmises, without referring to any evidence in the record, that Mikuski transferred the money to Roig. This assertion is unsupported by any physical evidence and is discredited by Faulkner's testimony regarding his search on scene. Specifically, Faulkner testified that the officers on scene patted down Roig and found no money inside his pockets. Considering Faulkner testified that he never lost sight of Mikuski and Roig, it is doubtful that the money could have been hidden in the short period of time between the transaction and the search of Roig and Mikuski moments thereafter.

[16] Prior to trial, the parties reached an agreement that the state "would not present expert testimony from its witnesses regarding narcotics trafficking." *State* v. *Massaro*, supra, 205 Conn. App. 704.

[17] Upon defense counsel's objection to the entire line of questioning, the trial court excused the jury to hear arguments pertaining to the legal issues underlying the objection. The trial court ruled that Pagoni had not testified as an expert for the defense or the state. It further determined that the prosecutor was entitled to cross-examine Pagoni to challenge his credibility regarding his law enforcement background and, specifically, his experience in the narcotics division.

[18] On appeal to this court, the defendant challenges questions asked earlier in the cross-examination by claiming that defense counsel challenged the "whole line of questioning . . . ." The questions asked earlier in the cross-examination were not challenged with any specificity in his motion for a new trial or in his brief to the Appellate Court. The Appellate Court thus did not consider any claims beyond those identified in the motion for a new trial and raised in his appellate brief. See *State* v. *Massaro*, supra, 205 Conn. App. 703 and n.17, 705 and n.18. Because our certified question is limited to whether the Appellate Court correctly concluded that the error was harmless, we do not consider claims not raised in the Appellate Court. See, e.g., *State* v. *Turner*, 334 Conn. 660, 686 n.13, 224 A.3d 129 (2020).